MOORE, Chief Justice
(concurring in the result in part and dissenting in part).
I concur in the result in part and dissent in part. I not only agree that this case should be dismissed, but I would go further and say that it should be vacated. As I explain in this special writing, the trial court never had subject-matter jurisdiction over the original complaints. Therefore, the circuit court’s every act — from the first day — was illegal and is void. I cannot concur with the rationale of the majority opinion because the “Liability Order,” which was not a legal order in the first place, could never be final. Therefore, while I agree with this Court in finally ending the judicial system’s usurpation of legislative power by dismissing this case, I state unequivocally my opposition to a court even beginning to exercise such power.
The question before this Court is whether the order in what has been termed the “Liability Phase” of the Equity Funding Case, entered on March 31, 1993, declaring that Alabama’s public-education system violated Art. I, §§ 1, 6, 13, and 22, and Art. XIV, § 256, Ala. Const.1901, was a final, appealable order. Because the issues involved in the plaintiffs’ complaint and the trial court’s orders involved nonjusticiable political questions, the trial court lacked *842 subject-matter jurisdiction[24] to issue the March 31, 1993, order — or any other order in this case.[25] Therefore, the March 31, 1993, order could never become final and appealable; it was void ab initio. Even if it was not void, there is a fundamental problem with one of the grounds upon which that order was based, i.e., the basis of equal protection under the Alabama Constitution of 1901. In Ex parte Melof, 735 So.2d 1172 (Ala.1999),. this Court determined that an equal protection clause does not exist and has never existed in a combination of §§ 1, 6, and 22, Ala. Const. 1901. Also, with respect to the trial court’s August 13, 1991, order, because no party had standing to contest the constitutionality of § 256 and/or Amendment 111, which, among other things, amends § 256, the court lacked jurisdiction. I would vacate all judgments heretofore entered in these cases and then dismiss them.

Peculiar Nature of this Case

On February 2, 2001, Governor Don Sie-gelman prorated state funds at 6.2%. In order to stop proration from affecting the order in the Equity Funding Case, the Alabama Coalition for Equity (“ACE”), the original plaintiff in the Equity Funding Case, sought a declaratory judgment in the Montgomery Circuit Court. The circuit court granted ACE injunctive relief on February 22, 2001. On appeal to this Court, the intervenors, as well as ACE, raised the issue of the constitutionality of the proration order, based on the orders that had been entered in the Equity Funding Case. It was clear that the finality of the March 31, 1993, order in the Equity Funding Case was critical to any resolution of that issue. We ordered the parties to address the question of the finality of that order, and during the study of that question, discovered that the trial court may well have lacked jurisdiction to rule in the Equity Funding Case. That discovery led to our order to the parties to brief the issues of the jurisdiction of the trial court to rule and the constitutionality of that March 31, 1993, order and all other orders associated with the Equity Funding Case.
This Court has never had to deal with a case as unusual as this one, and it is unusual in several ways. The trial court violated the limits of its own jurisdiction with respect to the other two branches of *843 the civil government of this State, to which the Constitution delegates the power to establish a public-education system. As I explain below, the very name of the case— “Equity Funding”[26] — describes the jurisdictional violation committed by the trial court.
While this case was pending in the trial court, the then governor was convicted of a felony; that, in turn, produced the unusual occurrence that several of the plaintiffs realigned themselves as defendants, so that there appeared to be adverse parties and a case and controversy during the 42-day period within which an appeal could be taken. In reality there was no case or controversy and there were no adverse parties. Lacking a case or controversy, the case should have been dismissed. Lacking any disagreement between the parties, there was no case or controversy before the March 31,1993, order was certified as final on June 9, or during the 42-day appeal period following that date. Nor did the trial court allow any other interested parties to intervene in the case.[27]
While the case was pending before the trial court, the trial judge campaigned for a position on the Alabama Supreme Court as “The Judge for Education Reform,” In his campaign literature he stated that he was a “tough judge” because he had ruled “Alabama’s education system unconstitutional,” “order[ed] the Legislature back to work,” and told “a governor and the Legislature to fix the problem.” Those public statements ultimately forced his removal from the case while it remained pending. However, before his removal, the trial judge declared his orders final and then continued to order hearings and different *844 forms of relief, in contradiction to the supposed finality of his own order. Using racism as a basis, the trial court declared all of the education portion of Amendment 111, Ala. Const.1901, unconstitutional, but preserved a portion of the original Art. XIV, § 256, Ala. Const.1901. He divided the case into two parts — a “Liability Phase” and a “Remedy Phase” — a faulty distinction. Then, using one word found in § 256 — “liberal”—the trial judge renovated and reformed the entire education system to the tune of an estimated $1 billion and instituted a scheme of continuing supervision by his court of every aspect and agency of the entire Alabama education
system, including the Alabama Legislature, the Governor, and the State Board of Education.
The orders issued to promulgate this plan would necessarily require an increase in taxation, amounting to taxation without representation, and would create a “right” to public education which was expressly prohibited by Amendment 111. The trial judge proceeded to set up this program even though the Legislature was not properly a party to the action. He went to great lengths to micromanage the State’s school system, to the point of requiring that adequate toilet paper be provided for each student.[28] A trial court in a proper *845 case may hold an act of the Alabama Legislature unconstitutional, but to enter an order that would require the Legislature to pass legislation and spend money on an education project of the trial judge’s own making is unprecedented in the history of this State.[29] By its wholesale striking of Amendment 111, the trial court appears to have attempted to create a new right to public education, disregarding the expressed wishes of the people as set forth in Amendment 111 to the Alabama Constitution.[30] Even if the trial court had had jurisdiction — and I conclude that it did not — we should not ignore an abuse of power by the judicial branch that represents an attempt to change our constitution.
It is not surprising that there has been a lack of clarity on several matters in this litigation. The trial court made legislative and executive, instead of judicial, decisions. While some states have been willing to allow their courts to make extensive and endless forays into supervising education in the name of necessity, particularly in this type of litigation, see Chief Justice Hooper’s dissent in Ex parte James, 713 So.2d 869, 906-08 (Ala.1997), Alabama must not make such a fundamental error. Any change to our constitution must be effected only by the lawfully established amendment process. Under our constitution, the power over public education belongs to the Legislature, not the courts. Am attempt to usurp that power by the judicial branch is a fundamental breach of the separation-of-powers doctrine and an improper subject of the court’s jurisdiction. Courts issue opinions that are binding on the parties to a particular case and controversy; those opinions have prece-dential value only so far as they correctly interpret and faithfully apply the law.

Procedural History

The March 31, 1993, order is but one of numerous orders the Montgomery Circuit *846 Court issued in this case, and it is but one of several the circuit court certified as final, appealable orders.
Those orders, collectively part of what is known as the “Equity Funding Case,” originated with a complaint filed in the Montgomery Circuit Court on May 3,1990, by ACE. Additional plaintiffs filed separate actions, and the circuit court subsequently consolidated those cases. The plaintiffs sought both declaratory and in-junctive relief, but did not seek money damages.
The plaintiffs requested a declaration that Alabama’s public-education system violated schoolchildren’s statutory and constitutional rights to a state-funded education. On August 13, 1991, the circuit court purported to grant plaintiffs’ summary-judgment motion, declaring that § 256, Ala. Const.1901, as amended by Amendment 111, violated the Fourteenth Amendment to the United States Constitution and that all but the first sentence of § 256 as it originally appeared in the Alabama Constitution of 1901 was without force and effect because it violated the Equal Protection Clause of the Fourteenth Amendment.
The trial judge again purported to grant declaratory relief on March 31, 1993. Based on evidence admitted at trial, the trial judge ruled “[t]hat the present system of public schools in Alabama violates the aforesaid constitutional and statutory rights of plaintiffs.” Opinion of the Justices No. 888, 624 So.2d at 166 (Ala.1993). (For full transcript of March 31, 1993, order, see 624 So.2d at 110-67.)
The March 31, 1993, order also purported to provide injunctive relief, stating “[t]hat the state officers charged by law with responsibility for the Alabama public school system, are hereby enjoined to establish, organize and maintain a system of public schools, that provide equitable and adequate educational opportunities to all school-age children.” 624 So.2d at 166.
On June 9, 1993, the trial judge purported to certify the March 31, 1993, order as a final, appealable order pursuant to Ala. R. Civ. P. 54(b). Because of the rather unusual sequence of events related above, some of the named plaintiffs who were initially defendants again became defendants. Because they had previously supported the plaintiffs position, these defendants understandably did not appeal the March 31, 1993, order within the 42 days required by the Alabama Rules of Appellate Procedure for taking an appeal.
The issue of the finality of the March 31, 1993, order has been raised before by parties in the Equity Funding Case and summarily referenced by this Court. In one of its opinions in this case, this Court operated on the assumption that the March 31, 1993, order was properly certified as a final order under Rule 54(b), Ala.R.Civ.P., and that it had not been appealed or could not be appealed.[31] On June 29, 2001, after *847 reviewing an appeal dealing with the pro-ration of Alabama’s education system, we requested the parties to brief this Court as to whether the Montgomery Circuit Court had issued a final judgment in this case. Although this question did not come before this Court in an appeal from the order, the finality of which was being questioned, this Court has jurisdiction to review the finality of the March 31, 1993, order because the trial court did not have subject-matter jurisdiction to issue that order. We may review a question of lack of subject-matter jurisdiction at any time:
“[Ljack of subject-matter jurisdiction is not waivable and may be raised at any time by either the parties or by the court, ex mero motu. Ex parte Johnson, 715 So.2d 783 (Ala.1998); Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143 (Ala.Civ.App.1986). ‘ “The question of jurisdiction is always fundamental, and if there is an absence of jurisdiction, over the person, or the subject matter, a court has no power to act, and jurisdiction over the subject matter cannot be created by waiver or consent.” ’ Poff v. General Motors Corp., 705 So.2d 442, 443 (Ala.Civ.App.1997) (quoting B.F. Goodrich Co. v. Parker, 282 Ala. 151, 155, 209 So.2d 647, 650 (1967)).”
State Dep’t of Rev. v. Medical Care Equip., Inc., 737 So.2d 471, 473 (Ala.Civ.App.1999).
“Furthermore, the lack of subject matter jurisdiction is an issue that is reviewable at any time, whether or not it has been preserved by way of objection.”
Ex parte Tuck, 707 So.2d 292, 294 (Ala.Crim.App.1997). With this opinion, I address that issue specifically and in a more detailed manner than has heretofore been provided.

The Orders

August IS, 1991, Order Certified as Final on October 18, 1991

Section 256, as amended by Amendment 111, expressly states that it is the policy of the State to promote education, but that there is no right to an education at public expense.[32] The circuit court ruled that *848 Amendment 111 is unconstitutional because it violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The stated reason for its ruling was that other parts of Amendment 111, adopted in 1956, were designed to permit the State to maintain a segregated public-school system in spite of the United States Supreme Court’s ruling in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). However, those parts of Amendment 111, which allowed the Legislature to authorize parents or guardians of children to elect to send the children to schools comprised of members of their own race, were never implemented by the Legislature; therefore, no injury ever occurred because of that language.
The August 13, 1991, order, although certified as final pursuant to Rule 54(b), Ala.R.Civ.P., was never appealed.

March SI, 199S, Order Certified as Final on June 9, 199S

The circuit court bifurcated the nonjury trial into what it called a “Liability Phase” and a “Remedy Phase.” Trial in the Liability Phase began on August 3, 1992, and was completed on August 27, 1992. Not until March 31, 1993, did the trial court issue its ruling purporting to grant declaratory and injunctive relief, which was improperly titled a “Liability Order.” The term “Liability Order” suggests that the trial court found only that some legal standard had been breached and that no remedy had yet been provided. However, on the face of the March 31, 1993, order, an injunction' — a form of remedy — was issued, ordering state officials to establish a school system meeting as yet unidentified requirements of State law.
. The March 31, 1993, order also set the matter, for a status conference to be held on June 9, 1993 “for the purpose of establishing the procedures and timetable for determination of an appropriate remedy in this case.” 624 So.2d at 166. Even though the trial court certified the March 31, 1993, order as final, and therefore ap-pealable, on June 9, 1993, it held a hearing the same day to determine the dates for further proceedings. It also issued an order purporting to provide further injunc-tive relief to the plaintiffs even though the period within which to appeal the March 31, 1993, order had not elapsed. In other words, the circuit court itself, by continuing to hold hearings and provide further relief, did not treat the March 31, 1993, order as final under recognized legal standards, even after it had certified it as such.

June 9, 199S, Certification of March SI Order as Final

On June 9, 1993, the circuit court issued an order that (a) directed the defendants to cooperate with the plaintiffs in developing a remedy, (b) directed the defendants to submit a proposed remedy by a day certain, (c) appointed Professor Wayne Flynt as “court facilitator,” (d) allowed attorney fees and costs to the plaintiffs, and (e) “pursuant to Rule 54(b), the Court certifie[d] th[e] Order as a final judgment.”

*849
December 3, 1993, Order Certified as Final on October 6, 1995

The defendants submitted a proposed “Remedy Plan,” which the circuit court, subject to a “fairness hearing,” incorporated into an order it issued on October 22, 1993. Following a fairness hearing on November 18, 1993, the circuit court incorporated a modified Remedy Plan into an order it issued on December 3,1993.
A copy of the entire Remedy Order is found as an appendix to Chief Justice Hooper’s dissent in Ex parte James, 713 So.2d 869, 923 (Ala.1997). By that order, the circuit court judge used legislative and executive powers to conform the Alabama school system with his vision for public-education reform. That order contained, in embryonic form, further orders the circuit court would be required to issue to accomplish that reform. Those orders would have ensured, among other things, that the Legislature appropriated sufficient moneys to fund the program, that teachers would be trained and paid in accordance with the trial court’s specifications, and that students would be inculcated with the values the trial judge believed were important.

October 6, 1995, Order Certified as Final on October 6, 1995

Because of a series of events I recount in detail at the end of this opinion, the December 3, 1993, order was not made final until October 6, 1995, by an order of the trial judge who had succeeded the original trial judge after he was removed from the case by the Judicial Inquiry Commission for his campaign conduct relating to the case. In its opinion, the Judicial Inquiry Commission stated that he was “disqualified from continuing to sit in the case.” Between December 3, 1993, and May 19, 1995, the circuit court had denied certain parties the right to intervene. This Court reversed that order on May 19, 1995. Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995).
The circuit court purported to certify a “Remedy Order” as final, and therefore appealable, on October 6, 1995. The succeeding judge made one modification to the original trial judge’s December 3, 1993, “Remedy Order” by striking paragraph XI(F). That paragraph stated that the trial court retained jurisdiction to issue further orders. Yet at the same time the trial judge asserted the trial court’s “inherent power to issue such orders as necessary to render its judgments effective,” Governor Fob James filed a timely appeal of that order.
The Alabama Supreme Court vacated the December 3, 1993/October 6, 1995, order on January 10, 1997, to the extent that it concerned the implementation of the Remedy Plan. Ex parte James, 713 So.2d 869, 935 (Ala.1997). This Court then remanded the case to the trial court with directions that that court stay the action “while retaining jurisdiction” for one year to allow coordinate branches of the government to formulate a plan complying with the March 31,1993, order.

February 6, 1996, Order Reversed on January 10, 1997

On February 6, 1996, after the December 3, 1993/October 6, 1995, order had been certified as final pursuant to Rule 54(b), the circuit court issued another order, this time appointing an independent monitor to report to the trial court regarding the implementation of the remedy plan. The trial judge issued that order in spite of the fact that she had certified the October 6, 1995, order as final under Rule 54(b), Ala.R.Civ.P., and the Equity Funding Case was pending on appeal. Like the original trial judge, she did not treat the order as final and appealable, in spite of her own Rule 54(b) certification.

*850
May 15, 2001, Order

Following this Court’s decision on January 10, 1997, there were no further proceedings until March 21, 2001, when certain plaintiffs moved to reopen the case for remedy proceedings because they believed that no adequate remedy plan had been developed. On May 15, 2001, the trial judge ordered the State Board of Education to file its proposed remedy plan by October 15, 2001, and ordered responses from the plaintiffs to that proposed plan by November 21, 2001. She set the case for hearing on December 5, 2001.

Finality of the March 31, 1993, Order

Courts have inherent authority to issue final judgments:
“The Constitution of Alabama of 1901 vests the judicial power in the Unified Judicial System. Ala. Const.1901, amd. 328, §§ 6.01(a). The judicial power, at its core, is the power to render final judgments in cases before the courts. See Marbury v. Madison, 5 U.S. (1 Crunch) 137, 177, 2 L.Ed. 60 (1803) (‘It is emphatically the province and duty of the judicial department to say what the law is.’); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (stating that the Constitution gives the ‘Judiciary the power, not merely to rule on cases, but to decide them’); Sanders v. Cabaniss, 43 Ala. 173, 177 (1869) (stating that the judicial power requires the exercise of judgment in a case or controversy). Inherent in the constitutional obligation to render final judgments is the power to conduct judicial proceedings in an efficient and effective manner.”
Ex parte Segrest, 718 So.2d 1, 5 (Ala.1998). If an Alabama trial court goes further and issues an order it does not have jurisdiction to enter, the order is void and can never be final. It is this Court’s duty to vacate such an order.
The rationale behind a Rule 54(b) certification is that it is more efficient to have a single appeal than to have multiple appeals. Without interlocutory appeals, a trial will proceed more rapidly to completion. The basis for Rule 54(b) certification entails more than mere policy considerations. A trial court continues to have jurisdiction until a case is final, and two courts (trial and appellate) cannot have jurisdiction at the same time. In this case, however, Rule 54(b) certification has been used to multiply, rather than to reduce, the number of appeals.
A commonly used definition of the term “final judgment” is that it is an order that “ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.” Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). The distinction is clearer in cases at law where money damages are the remedy sought. Thus, where a court issues an order establishing liability for damage but has delayed hearings on the amount of damages, it has not issued a final judgment. Moody v. State ex rel. Payne, 351 So.2d 547 (Ala.1977).
For example, consider a typical action in negligence arising out of injuries sustained in an automobile accident. The question of breach of duty is analytically distinct from the question of the amount of damages. It is not necessary to determine the amount of damages in order to determine whether there has been a breach of duty. If a driver crosses the centerline because he is distracted while talking on his cellular telephone and hits an oncoming car, his breach of duty can be determined without knowing what the damages are. Yet a judgment entered on his liability would not be final and appealable until damages are determined and awarded.
*851 By the eighteenth century, English courts were applying different rules in equity cases. Appeals might be taken from interlocutory orders and decrees as well as from final decrees. Crick, The Final Judgment Rule as a Basis for Appeal, 41 Yale L.J. 539, 541-43, 545^8, 550 (1932). The trend in American courts, on the other hand, has been to apply the common-law rule of final judgments to equity cases. 41 Yale L.J. at 541-43, 545-48, 550.
During the course of this litigation the circuit court judges certified several orders as final, but it is primarily the March 31, 1993, order with which this Court is concerned. Rule 54(b), Ala.R.Civ.P., states:
“When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.”
The common-law rule is that orders may not be reviewed until all matters in a particular case are final. Because modern rules of civil procedure generally provide for more liberal joinder of parties and claims in a single action, it is necessary also to give some flexibility to the finality rule. That, in part, is the purpose of Rule 54(b). That rule provides that a trial court may certify certain orders as final, and therefore appealable, even if all claims of all parties have not been finally resolved by the trial court.[33] The plaintiffs in this case argue that the March 31, 1993, order resolved fewer than all claims and that the resolved claim was separate and distinct from the unresolved ones. However, Rule 54(b) does not change the common-law standard of finality as to individual claims or parties. A Rule 54(b) certification cannot make final an order that is not inherently final, such as the denial of a motion for a summary judgment. It is my opinion that the March 31, 1993, order resolved nothing at all.
The plaintiffs contend that one of the claims was made final by the order of March 31, 1993; however, all of the claims are intertwined and focus on the alleged unconstitutionality of Alabama’s public-school system.. Whether any claim is or is not final depends upon whether the order reaches a definitive resolution. The Rule 54(b) partial-claim adjudication rule stated above applies to one or more, but not all, of the claims being adjudicated to a complete resolution. It does not allow an incomplete resolution of one claim. Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 742-44, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (interpreting Rule 54(b), Fed.R.Civ.P.).
In many cases, the award of equitable relief is functionally, if not essentially, the same as the award of damages, and there clearly is no need for more than one final order in a particular action. For example, ordering specific performance of a contract is functionally the same as awarding damages. The order is final, and although the damages award is not an order directed personally to the defendant, if he does not pay voluntarily, the court may have to issue subsequent orders to execute the judgment. Other equity cases may not *852 bear as marked a similarity to cases at law for damages. For example, an order to partition real estate may be final even though the court issues a subsequent order calling for an accounting, which may also be final.
The plaintiffs argue that this case has been properly divided into a “Liability Phase” and a “Remedy Phase” that are analytically distinct. In other words, liability can be determined without determining an appropriate remedy. Additionally, the plaintiffs argue that because the remedy sought and awarded in this case is equitable in nature, this action can have more than one final order. The interve-nors in the proration case (the universities), which have filed briefs in response to this Court’s question as to the finality of the March 31, 1993, order, argue that the distinction between law and equity has been abolished in Alabama and that the same finality rule that applies to cases where the plaintiff seeks damages at law should apply to cases where the plaintiff seeks an equitable remedy. In short, the plaintiffs argue that the 'Case should be treated as a case in equity, while the inter-venors argue that the case should be treated like any action at law for purposes of applying the final-order rule.
The question of the finality of an order is one of jurisdiction. “A final judgment is necessary to give jurisdiction to this court on appeal.” Marsh v. Wittmeier, 280 Ala. 172, 173, 190 So.2d 920, 920 (1966).[34] The purpose of Rule 54(b), Ala.R.Civ.P., is to make final “an order which does not adjudicate the entire case but as to which there is no just reason for delay in the attachment of finality.” Foster v. Greer & Sons, Inc., 446 So.2d 605, 609 (Ala.1984), overruled on other grounds, Ex parte Andrews, 520 So.2d 507 (Ala.1987).
Rule 54(b) does not create an exception to the rule that finality is required in order for a judgment to be appealable.
“[N]one of the procedures that this Court has adopted to facilitate the policies underlying Rule 54(b) should be construed as relaxing the Rule 58 requirements for the entry of a proper judgment.... On the contrary, these provisions, taken in conjunction with the cases construing them, compel the conclusion that if an order entered in a case with multiple claims ‘does not meet the requirements of Rule 54(b),’ then ‘no formal “judgment” [has been] entered.’ ”
Burlington Northern R.R. v. Whitt, 611 So.2d 219, 223 (Ala.1992), quoting Balboa Ins. Co. v. Sippial Elec. Co., 379 So.2d 579 (Ala.1980).
“A final judgment is an ‘order that conclusively determines the issues before the court and ascertains and declares the rights of the parties involved.’ An order or ruling that ‘adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties.’ ”
Lunceford v. Monumental Life Ins. Co., 641 So.2d 244, 246 (Ala.1994) (citations omitted).
The proper use of Rule 54(b) dictates that even in actions involving multiple claims or parties there must be full adjudication of one claim or of all claims as to one party. Therefore, a ruling that holds a defendant liable without fully deciding the remedies is not final and cannot be the subject of a Rule 54(b) certification. A *853 prime example of this type of ruling was present in Liberty Mutual Insurance Co. v. Wetzel, supra. In that case, the trial judge, by entering a partial summary judgment, held the defendant liable but failed to determine the remedies. The United States Supreme Court held that “despite the fact that the District Court undoubtedly made the findings required under the Rule,[35] had it been applicable, those findings do not in a case such as this make the order appealable pursuant to 28 U.S.C. § 1291 [the federal equivalent to § 12-22-2, Ala.Code 1975]” 424 U.S. at 743-44, 96 S.Ct. 1202, because orders “where assessment of damages or awarding of other relief remains to be resolved have never been considered to be ‘final’ within the meaning of 28 U.S.C. § 1291.” 424 U.S. at 744, 96 S.Ct. 1202.
In this case, the trial court purportedly found liability and then ordered some remedies in its March 31, 1993, order, but left determination of other remedies for a later date. The order is not, by its own terms, a final disposition of the claim at issue in the case; therefore, it does not meet the standards of Rule 54(b). “[T]he trial court cannot confer appellate jurisdiction upon this court through directing entry of judgment under Rule 54(b) if the judgment is not otherwise ‘final.’ ” Robinson v. Computer Servicenters, Inc., 360 So.2d 299, 302 (Ala.1978). Thus, the March 31, 1993, order cannot be considered a final, and therefore appealable, order.
This Court explained the requirement in Jewell v. Jackson & Whitsitt Cotton Co., 331 So.2d 623, 625 (Ala.1976). There the Court stated:
“A final judgment is a terminative decision by a court of competent jurisdiction which demonstrates there has been complete adjudication of all matters in controversy between the litigants within the cognizance of that court. That is, it must be conclusive and certain in itself. All. matters should be decided; damages should be assessed with specificity leaving the parties with nothing to determine on their own. A judgment for damages to be final must, therefore, be for a sum certain determinable without resort to extraneous facts.”
(Citations omitted.) Nevertheless, as stated earlier, where a court anticipates further “remedies,” an order will not be considered final. In other words, the Court erroneously fashioned different rules for finality in a case seeking equitable relief as opposed to one seeking money damages.
Such a ruling is at odds with the elimination of the distinction between law and equity, accomplished in Alabama in 1973.[36] This Court has emphasized on several occasions that “it should be remembered that the procedural differences between law and equity have been abolished and there is only one form of action, known as a ‘civil action.’ ” Du Boise v. Brewer, 349 So.2d 1086, 1087 (Ala.1977). It is also at odds with other rulings of this Court, where the rule of requiring “complete disposition” of a claim has been applied in cases seeking equitable remedies. See Tubbs v. Brandon, 366 So.2d 1119, 1120 (Ala.1979) (applying the final-judgment rule in dismissing an appeal from an order in an action to enjoin the violation of a restrictive covenant); Chambers v. Chambers, 356 So.2d 634, 635 (Ala.1978) (dismissing an appeal *854 because “[a]s yet the trial court has not decided whether the property can be equitably divided, or whether a sale is necessary, or whether the multiple plaintiffs are entitled to the accounting requested”); Cates v. Bush, 293 Ala. 535, 307 So.2d 6 (1975) (applying the final-judgment statute in dismissing an appeal from a decree in a case involving, among other things, requests for sale of land); Cherokee County Hospital Bd. v. Retail, Wholesale & Department Store Union, 294 Ala. 151, 313 So.2d 514, 517 (1975) (dismissing an appeal in an action seeking an injunction).
It would be counterproductive to our unified system of law and equity to continue the distinction set forth in James v. Alabama Coalition for Equity; the result being that some cases would require finality and others would not, depending on the type of remedy sought. Moreover, to do so ignores the Supreme Court’s words in Liberty Mutual Insurance v. Wetzel: “[Wjhere assessment of damages or awarding of other relief remains to be resolved,” the order will not be considered final. 424 U.S. at 744, 96 S.Ct. 1202 (emphasis added).
Even in James, this Court quoted the proper standard for finality but elected to draw a distinction between final judgments at law as opposed to those at equity. Quoting Newton v. Ware, 271 Ala. 444, 450, 124 So.2d 664, 670 (1960), the Court stated: “ ‘If there is a decree directing further proceedings under the direction of the court in order to make the final decree effective, such decree is interlocutory and remains within the control of the court because as to such decree and further proceedings thereunder the cause remains in fieri.’ ” 713 So.2d at 945.
That description precisely defines the March 31, 1993, order, because the order itself expressly provided for further proceedings “for the purpose of establishing the procedures and timetable for determination of the appropriate remedy in this case.” Appendix to The Opinion of the Justices No. 338, 624 So.2d at 166. Thus, by this Court’s own words, if we ignore the distinction between law and equity, as we should, the March 31, 1993, order represented an interlocutory order, which the trial court could never make final unless he had fashioned a remedy.
This Court directed the parties to address the issue whether the March 31, 1993, order was a final, and therefore ap-pealable, order. Although the March 31, 1993, order is the only one directly at issue, the question cannot be answered without considering its relationship to the other orders entered in this case that were certified under Rule 54(b) or that were reviewed on appeal. The record shows that the circuit court contemplated the issuance of further orders and that it, in fact, issued further orders. The “Liability Order” contained partial remedies, demonstrated in part by the fact that the trial court stated that further proceedings would be necessary. In fact, in March of this year, the plaintiffs filed a motion to reopen the remedy proceedings and seek to refine and implement the “declaratory judgment” relief of the March 31, 1993, order. That order is still not final; it can never be final. I now consider whether the orders addressing the claims in this case could ever become final.

The Unconventional Aspect of this Lawsuit

Trying to determine whether this particular matter is equitable or legal in nature is the main problem with trying to determine whether the March 31, 1993, order is final. But this problem also provides the resolution to the matter because courts do not have subject-matter jurisdiction over political questions.
*855 The parties have cited and discussed numerous Alabama cases dealing with the issue of finality. The nature of this lawsuit and the various orders it has engendered is such that the orders are not susceptible to analysis by traditional judicial and common-law rules. Legal remedies and traditional equitable remedies have in common the purpose of restoring an injured party to his status before the injury or of making him whole. Those remedies, despite their differences, are designed to return the parties to the status quo they occupied before the alleged injury. The order of March 31, 1993, in spite of its apparent form as a judicial remedy, is not judicial in nature; it is a political decree, in the nature of a legislative enactment or an executive order. The nonjudicial character of the order makes it impossible for that order to be a final judgment. Legal remedies return the parties to their condition before the injury; the trial judge’s order of March 31, 1993, creates an entirely new relationship between the parties in the future. See “Liability Order,” attached as appendix to Opinion of the Justices No. 338, 624 So.2d at 110-67, for examples of the trial judge’s requirements, most of which are not legally quantifiable by the Alabama Constitution.
This lack of judicial character to the March 31, 1993, order is the primary reason it was not a final, appealable order. It was a political decree issued to coequal branches of the government, one of which — the Legislature' — was not properly a party to the case.[37] The order did not direct a party to perform an identifiable legal duty, which the court had authority to issue. The order did not provide a judicial remedy but pretended to establish an ongoing relationship between the trial court and the Legislature and the governor. The circuit court, by that order and by the others that followed it, established itself as the Superintendent of the Alabama Public Education System. The potential term of that position was, at the time the order was issued, and is now, indeterminable. The number of prospective orders is also indefinite.
Although this type of “lawsuit” has not been common to Alabama, recent legal history shows that it has occurred often enough in other states to acquire certain labels and identifying characteristics.[38]

The Structural Injunction

A traditional injunction seeks to restore a party by ordering an offending party to cease some harmful behavior or to undo some harm done or to perform a specific legal duty. It is judicial and remedial in nature. It is designed to restore a party following some harm done or to ensure a discontinuation of some harmful action. Injunctions must be clear, and they must be confined to the wrong done. “Typically in these traditional injunctions, the injunctive order requires or prohibits a discrete, uni *856 tary act; when the injunction is issued, the case is over.” Dan B. Dobbs, The Law of Remedies 641 (2d ed.1993).
The types of “remedy” imposed in equity funding cases in some states are so different that they have been termed “structural injunctions,” meaning that their purpose is to restructure a governmental institution, a power clearly outside the purview of the judiciary. In order to restructure the education system, the trial judge must restructure the relationship of the three branches of government. This de facto amending of the constitution usurps not only the powers of the legislative and executive departments, but also usurps a basic principle of the rule of law requiring the consent of the governed. The people of Alabama have not entrusted to the courts the executive and legislative powers, nor have they delegated to the courts the authority to make major structural changes to the Alabama Constitution. The trial judges in this case appear to have acted less as judicial officers and more as legislators, executive branch agents, and school superintendents.
The school-equity funding cases involve injunctive remedies of a very different nature from those sought in the traditional lawsuit. The typical structural injunction is aptly described
“as a cycle in which the court issues a general injunctive decree, which is followed by disobedience or unsatisfactory compliance, which is followed by further hearings, and a supplemental decree stating in more detail what is required of the defendant. The cycle is then repeated several times, with each decree becoming more precise in its demands.”
Dobbs at 642. In this case there have already been numerous orders certified as final pursuant to Rule 54(b) or actually appealed. It is clear that the trial court expected to issue injunctions on a continuing basis, similar to a chief executive officer managing a business, or a superintendent managing a school system. Because those management decisions are based largely on policy judgments rather than on legal judgments, this Court would be called upon on appeal to perform the duties of a board of directors for a corporation or a school board for a school system rather than the duties of a court. And an appeal would presumably be available every time the trial court issued a “remedy” that it considered necessary for the “equitable and efficient” functioning of the state school system.
Twenty-six years ago, Professor Abram Chayes made this observation:
“We are witnessing the emergence of a new model of civil litigation and, I believe, our traditional conception of adjudication and the assumptions upon which it is based provide an increasingly unhelpful, indeed misleading framework for assessing either the workability or the legitimacy of the roles of judge and court within this model.”
Abram Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L.Rev. 1281, 1284 (May 1976). It is not at all surprising to find that the traditional common-law doctrine of finality cannot be applied to a case like the Equity Funding Case. The workability of the rules of procedure are predicated on the distinction between law and politics, and upon the separation of the legislative, judicial, and executive powers.

Characteristics of the Traditional Lawsuit as opposed to an Action Seeking a Structural Injunction

Western law, particularly constitutional law, builds upon a distinction between law and politics. This is the fundamental separation between the political (i.e., legislative and executive) and judicial branches of *857 government. Political bodies render decisions on policy matters but as to the manner of reaching those decisions, there is a fundamental difference between the judicial process and the political process. Judicial bodies are set up to operate very differently from legislative and executive bodies with respect to the rendering of decisions or judgments. Professor Chayes provides a very useful summary of what he calls the “defining features” of a traditional lawsuit:
“(1) The lawsuit is bipolar. Litigation is organized as a contest between two individuals or at least two unitary interests, diametrically opposed, to be decided on a winner-takes-all basis.
“(2) Litigation is retrospective. The controversy is about an identified set of completed events: whether they occurred, and if so, with what consequences for the legal relations of the parties.
“(3) Right and remedy are interdependent. The scope of the relief is derived more or less logically from the substantive violation under the general theory that the plaintiff will get compensation measured by the harm caused by the defendant’s breach of duty — in contract by giving plaintiff the money he would have had absent the breach; in tort, by paying the value of the damage caused.
“(4) The lawsuit is a self-contained episode. The impact of the judgment is confined to the parties. If plaintiff prevails there is a simple compensatory transfer, usually of money, but occasionally the return of a thing or the performance of a definite act. If defendant prevails, a loss lies where it has fallen. In either case, entry of judgment ends the court’s involvement.”
Chayes at 1282-83 (footnotes omitted).
Comparing the traditional lawsuit to the public-interest lawsuit, Chayes notes that the public-interest lawsuit, which represents a court’s attempting to act improperly in the stead of a Legislature, differs at every point from the traditional lawsuit.
“The party structure is sprawling and amorphous, subject to change over the course of the litigation.... The judge is the dominant figure in organizing and guiding the ease, and he draws for support not only on the parties and their counsel, but on a wide range of outsiders — masters, experts, and oversight personnel. Most important, the trial judge has increasingly become the creator and manager of complex forms of ongoing relief, which have widespread effects on persons not before the court and require the judge’s continuing involvement in administration and implementation.”
Chayes at 1284.
The litigation before us does not focus on a particular wrong done to some plaintiff or group of plaintiffs but on the application of regulatory policy to the activities of a different branch of civil government. In this type of case, the court does not apply the law to provide a remedy for a past wrong but establishes a regime ordering the manner of the future interaction of the parties and subjects the parties to continuing judicial oversight.
“The traditional model of adjudication was primarily concerned with assessing the consequences for the parties of specific past instances of conduct. This retrospective orientation is often inapposite in public law litigation, where the lawsuit generally seeks to enjoin future or threatened action, or to modify a course of conduct presently in train or a condition presently existing.”
Chayes at 1296 (footnotes omitted).
“In the remedial phases of public law litigation, factfinding is even more clear *858 ly prospective. As emphasized above, the contours of relief are not derived logically from the substantive wrong adjudged, as in the traditional model. The elaboration of a decree is largely a discretionary process within which the trial judge is called upon to assess and appraise the consequences of alternative programs that might correct the substantive fault. In both the liability and remedial phases, the relevant inquiry is largely the same: How can the policies of a public law best be served in a concrete case?
“In public law litigation, then, fact-finding is principally concerned with ‘legislative’ rather than ‘adjudicative’ fact. And ‘fact evaluation’ is perhaps a more accurate term than ‘factfinding.’ The whole process begins to look like the traditional description of legislation: Attention is drawn to a ‘mischief,’ existing or threatened, and the activity of the parties and court is directed to the development of on-going measures designed to cure that mischief. Indeed, if, as is often the case, the decree sets up an affirmative regime governing the activities in controversy for the indefinite future and having binding force for persons within its ambit, then it is not very much of a stretch to see it as, pro tanto, a legislative act.”
Chayes at 1296-97 (footnotes omitted).
“[Tjhe prospective character of the relief introduces large elements of contingency and prediction into the proceedings. Instead of a dispute retrospectively oriented toward the consequences of a closed set of events, the court has a controversy about future probabilities. Equitable doctrine, naturally enough, given the intrusiveness of the injunction and the contingent nature of the harm, calls for a balancing of the interests of the parties.”
Chayes at 1292-93.
In addition, the remedy is independent of the right violated and is usually structural in nature.
“The centerpiece of the emerging public law model is the decree. It differs in almost every relevant characteristic from relief in the traditional model of adjudication, not the least in that it is the centerpiece. The decree seeks to adjust future behavior, not to compensate for past wrong. It is deliberately fashioned rather than logically deduced from the nature of the legal harm suffered. It provides for a complex ongoing regime of performance rather than a simple, one-shot, one-way transfer. Finally, it prolongs and deepens, rather than terminates, the court’s involvement with the dispute.”
Chayes at 1298.
“At this point, right and remedy are pretty thoroughly disconnected. The form of relief does not flow ineluctably from the liability determination, but is fashioned ad hoc. In the process, moreover, right and remedy have been to some extent transmuted. The liability determination is not simply a pronouncement of the legal consequences of past events, but to some extent a prediction of what is likely to be in the future. And relief is not a terminal, compensatory transfer, but an effort to devise a program to contain future consequences in a way that accommodates the range of interests involved.”
Chayes at 1293-94 (footnotes omitted).
Moreover, in such cases, the lawsuit is ongoing.
“Once the ongoing remedial regime is established, the same procedure may be repeated in connection with the imple *859 mentation and enforcement of the decree. Compliance problems may be brought to the court for resolution and, if necessary, further remediation. Again, the court will often have no alternative but to resort to its own sources of information and evaluation.
“I suggested above that a judicial decree establishing an ongoing affirmative regime of conduct is pro tanto a legislative act. But in actively shaping and monitoring the decree, mediating between the parties, developing his own sources of expertise and information, the trial judge has passed beyond even the role of legislator and has become a policy planner and manager.”
Chayes at 1301-02 (footnotes omitted).

Characteristics of the Equity Funding Case

The course of events in the Equity Funding Case place it squarely in the public-interest-lawsuit category, not the traditional-lawsuit category. The traditional rules of procedure are not designed for the public-interest lawsuit because by its very nature that type of lawsuit involves a legislative and an executive determination rather than a judicial determination. The common-law rule as to the finality of judgments does not work with respect to public-interest litigation because that rule is designed for judicial proceedings, not determinations by the legislative branch or the executive branch. I now analyze the Equity Funding Case as public-interest litigation.
(1) The parties involved. A trait of public-interest litigation is that it directly affects a vast number of persons, many or most of whom are not represented as parties in the litigation. The Equity Funding Case involves every school-age child in the State of Alabama and every taxpayer. In the Liability Order of March 31, 1993, and the order of December 3, 1993, the trial court presumed to order the Legislature to raise and appropriate moneys to fund the circuit court judge’s vision for Alabama’s education system. Legislators are bound by oath to uphold the constitution and the laws of Alabama and the United States. Can the Legislature properly be a party to such an action and how can the Legislature be bound by a court order in a proceeding in which it is not a party? How does a Legislature defend itself in court, even if it is properly a party? How does it even appear in court? The Equity Funding Case affects multiple parties and people not even represented in the proceedings and is, therefore, more akin to the public-interest lawsuit than a traditional lawsuit. To enact a judge’s public policy vision for the schools represents an attempt to have the judiciary act in a legislative capacity.
The plaintiffs’ counsel have argued that the orders in this case are simply equitable remedies long recognized and enforced by the courts. However, there are practical difficulties with that position. Courts use their contempt powers to enforce injunctions. Are we to believe that the circuit judge of Montgomery County has the power to hold the Legislature in contempt and that it has the power to confine those legislators who do not vote to appropriate funds sufficient to finance the judge’s vision for public-school education? If those confined legislators prove recalcitrant and continue to refuse to comply with those orders, will the judge commandeer the Department of Revenue, and, in its stead, commission officers who would be willing to impose a tax on the people of Alabama in order to fund this newly revised education system?
(2) Prospective in nature. The course of this litigation was not designed to determine if harm had been done to any partic *860 ular party or -parties with a view to fashioning a remedy that would restore that party or those parties to the status quo ante. It involved the kind of fact-finding process characteristic of the legislative process. It was designed to identify a social problem in the Alabama education system. The legislative and executive branches apparently did not respond to the plaintiffs’ satisfaction to perceived problems in Alabama’s education system; therefore, they sought a remedy in court by way of a judicial decision. They found fault with the current education system, and instead of seeking new legislation or a constitutional amendment, they appeared before the trial court, as if it were the Legislature, with what they thought was a serious social problem, to lobby for “better” funding to enact their vision of a proper education system. The trial judge’s fact-finding did not fix fault on anyone in particular. The trial judge engaged in fact-finding that sought to discover a response to the general complaint that something ought to be done to better manage Alabama’s flawed education system.
(3) The remedy involved. The injunction sought and awarded in this case was clearly structural, not restorative, in nature. The orders were not remedies designed to restore parties who have been wronged in some particular way. Those orders were designed to restructure the largest single portion of Alabama’s civil government, its public life, and its public-school system. Those orders require increased taxation of Alabama citizens by an official most Alabamians had no say in electing. They impose duties on executive branch officers, and they even dictate what subjects students must study, what they must read, and what values the public-school teachers must inculcate in these students.[39]
*861 (5) The ongoing nature of the case. This case entails ongoing oversight and management of the entire Alabama system of public education. As this Court stated in Pinto: “[T]he court intended to oversee and direct the processes of education ‘reform’ for an indefinite period.” 662 So.2d at 899. This case has already spanned 12 years, and there is presently no end in sight. See the appendix to Chief Justice Hooper’s dissent in Ex parte James, supra.

Nonjusticiable Political Matter

False Distinction Between Liability Phase and Remedy Phase

The circuit court’s March 31,1993, order and its subsequent orders provided injunc-tive remedies. It is clear that the court and the parties contemplated that there would be a series of successive orders providing further relief. Those orders entailed the extensive and intrusive exercise by the trial judge of legislative and executive powers, in violation of the Alabama Constitution. The plaintiffs’ argument that the March 31, 1993, order was final, and therefore appealable, is predicated on a distinction between a liability phase and a remedy phase. The March 31, 1993, order, insofar as it has been referred to as a Liability Order is misnamed. The “Liability Order” contains declaratory and in-junctive remedies. It also imposed a partial (though vague and incomprehensible) remedy, which was in fact not a legal remedy — it was a political decree.
My belief that the March 31, 1993, order is not final, and therefore not appeal-able, is based only in part on the fact that it included a partial remedy. The flaw is more fundamental than the fact that there was a mixture of liability and remedy in the same order or that the remedy was incomplete. The distinction made in this case between a liability phase and a remedy phase is an artificial distinction borrowed from traditional lawsuits and imposed on this type of public-interest litigation. In a public-interest lawsuit, the liability and the remedy are “coterminous,” i.e., they have the “same or coincident boundaries” and are “coextensive in scope or duration.”[40] It would be impossible to separate the trial into conceptually distinct liability and remedy phases. An Equity Funding Case is not like a traditional negligence action. In a traditional lawsuit the determination as to whether a defendant has breached the duty of care (i.e., liability) is conceptually distinct from, and can be determined without any determination as to, the amount of recovery available (i.e., remedy). It is not necessary to determine the amount of damages in order to determine whether there was a breach of duty. However, even in the traditional lawsuit, the liability determination is not a final judgment. How much more is that the case here?
There is an even more fundamental problem with the Equity Funding Case. The liability and the remedy are not analytically distinct. It is impossible to know that an education system is deficient (i.e., that there is liability) unless the judge has determined that a constitutional right to an education requires a certain quality of education (i.e., a remedy). For example, a court could not have known that teachers are not being paid an adequate salary (liability) unless the court had already determined what the Constitution requires as to teacher’s salaries (remedy). The March 31, 1993, order simply asserts that the present education system is unconstitutional. The court did not at that time tell the defendants what to do to “fix” the lack *862 of equity in the education system. If the constitution does not quantify a standard, then a court may not simply make one up.
The defendants and others were told to fix the problem and then to check back with the court to determine whether they had fixed the problem to the judge’s satisfaction. If they did not respond correctly the first time, they would have to try again. The circuit court found that the defendants had breached an unknown, and unknowable, standard. In this case, the circuit court itself apparently did not know what the law requires because it reserved the complete remedy for a future determination.
The circuit court found itself in this intractable position because it adopted the fundamentally false proposition that every dispute involving a constitutional provision is subject to judicial resolution. The judgments involved in making educational decisions are fundamentally political in nature; therefore, they have been properly, delegated to the executive and legislative branches of government. They are not fundamentally political in nature simply because they involve a public controversy. They are fundamentally political in nature because of the reasoning process involved in making such decisions.[41]
The Alabama Constitution makes clear that the power to establish a system of public schools is delegated to the Legislature. This is true of both Amendment 111, which amended § 256 of the Constitution, and of § 256 itself. It is universally recognized that a Legislature makes laws that are in the public interest or common good.
Assuming that there is a public interest or common good that can be identified or agreed upon, the lawmaker determines, within the bounds of law, the best or most efficient legislative means to correct a social “evil.” The Legislature may attempt to justify the legislative means in one of two ways. First, it may justify a piece of legislation as an enactment or a particular *863 ization of something that is inherently right. In this instance, the lawmaker need not engage in a utilitarian calculation of whether a particular law will or will not promote the common good. The operative assumption is that doing the right thing necessarily advances the common good. This truth is encapsulated in the maxim, “honesty is the best policy.” It presumes the existence of a moral order that man can know and that man has the authority, at least in some limited way, to promote through positive law.
The second method of legislative decision-making involves something different from the direct implementation of basic moral postulates. Where there is no necessary right or wrong, the lawmaker must determine the most efficient way of achieving a particular end. The Legislature must project the outcome of alternative courses of action into the future. It may do so in a rather informal way by acting upon its common or collective experience. Ideally, at other times it will proceed with great deliberation, systematically and comprehensively collecting data, conducting hearings, calling upon experts, and reviewing studies to calculate the relative costs and benefits of various courses of action.
It is the cost-benefit utilitarian methodology that is most distinctly political, as opposed to judicial, in nature. The Legislature faces difficulties in making law by balancing interests or engaging in cost-benefit analyses. Those difficulties are further exacerbated when a court, designed to conduct a very different kind of evidentiary inquiry than that of a legislative body, assumes the legislative mantle.
The political methodology involved in law-making requires an entirely different approach than a judicial methodology. A legislative body, in making law, collects a wide range of information. It is forward-looking, because it gathers historic information with a view to accomplishing some future or ongoing goal of improving society. The end of the fact-gathering process is to develop a rule of law that courts can apply to the facts of particular cases. A court does not envision a future social goal and order the Legislature to conform to its vision of the future; that would be turning the constitutional system on its head and making the legislative branch dependent upon the judges instead of upon the voters the legislators represent.
The executive branch, as a political branch, makes decisions using essentially the same methodology as the legislative branch. Its discretion is limited not only by inherent standards of right and wrong and by the constitution but also by statutes passed by the Legislature. The executive branch makes utilitarian cost-benefit decisions as to the most efficient means of enforcing the law. For example, a prosecutor has discretion to decide the best way to enforce the law. He has discretion as to whom he will prosecute and for what crimes. Those decisions are not reviewable by a court unless the prosecutor is breaking the law in doing so.
The courts have no jurisdiction over the political branches of the government unless those branches break some provision of the law. Courts do not have the authority to review legislative or executive discretion, no matter how unwise or inefficient or even unfair they think the exercise of that discretion may be.
“ ‘[Questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom.’ ”
*864 Densmore v. Jefferson County, 813 So.2d 844, 850 (Ala.2001) (quoting City of Orange Beach v. Duggan, 788 So.2d 146, 151 (Ala.2000), quoting in turn Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 815 (1944)). “[I]t is not the duty of this Court to question the wisdom, or the lack thereof, used by the Legislature in enacting the laws of this State.” Ex parte T.D.T., 745 So.2d 899, 904 (Ala.1999).
“It scarcely need be said that the matter of policy is one for the Legislature, and whether wise or unwise is of no concern to the courts. We are called upon to determine the question of legislative power, and that alone.”
State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 342, 186 So. 487, 497 (1939). The Constitution provides for review of such political judgments. It is called an election.
The orders that the Montgomery Circuit Court issued and that provided in-junctive relief represented the exercise of wide-ranging executive and legislative powers. Those orders infringed upon the powers of the other branches of State government. It may be that the Alabama education system could be better funded and operated. Obviously, there is frustration in various sectors of Alabama with alleged inaction in this area by the Alabama Legislature. But such frustration in a portion of this State is no reason for this Court or for executive officers or even for the Legislature (which may wish to shirk the responsibility of making hard choices) to allow one circuit court judge in Montgomery County to take upon himself or herself such immense — and unconstitutional — authority.
Based on the remedies imposed in the various orders, including the March 31, 1993, order, the circuit court has engaged in a far-reaching exercise of legislative and executive powers in violation of the Alabama Constitution. And as discussed above, the remedies in a case of this nature are too intertwined with “liability” to separate them.
Because the “Liability Phase” cannot be distinguished from the “Remedy Phase” in an Equity Funding Case, the position that the attorney general has taken is as untenable as that taken by the plaintiffs. The attorney general has argued that the circuit court had jurisdiction to find that the State failed to provide a system of public education that complied with the Alabama Constitution, but that the circuit court had no jurisdiction to issue a remedy, and, if it did have such jurisdiction, the State was now in compliance. Because of the peculiar nature of this litigation, it is impossible to determine liability without also determining the remedy. The remedy determination is inherently political in nature. This Court has no more jurisdiction to determine whether the education system complies with whatever requirements can be divined from the word “liberal” in § 256 of the Alabama Constitution than do the trial courts. That is a political judgment not subject to judicial review. The laws the Legislature passes are subject to adjudication only if they violate the Constitution, and the manner in which the executive branch implements those laws is subject to adjudication only if in implementing the law that branch breaches a rule of law set down by the Legislature, not a standard of efficiency determined by a judge. There is no discretion on the part of those branches to break the law, and if an officer acts illegally he may be held criminally or civilly liable.

The Function of the Judiciary

The trial court lacks jurisdiction because the judiciary’s definitive function is to resolve disputes or controversies — not to make policy pronouncements on what the *865 courts have termed “nory'usticiable political questions.” We must define the judiciary’s function in order to follow the Alabama Constitution:
“The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.”
Ala. Const.1901, § 42.
“In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.”
Ala. Const.1901, Art. 3, § 43 (emphasis added). Any Alabama court that goes beyond its authority not only infringes upon the authority of another branch of government but also subverts the very foundation of our constitutional system. This separation-of-powers principle is derived from our federal Constitution.
In his 1796 farewell address as President, George Washington recognized the importance of maintaining that separation:
“It is important, likewise, that the habits of thinking in a free country should inspire caution in those intrusted with its administration to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of that love of power, and proneness to abuse it which predominates in the human heart is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories and constituting each the guardian of the public weal against invasions by the others, has been evinced by experiments ancient and modern, some of them in our country and under our own eyes. To preserve them must be as necessary as to institute them. If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the .Constitution designates. But let there be no change by usurpation; for though this in one instance may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use can at any time yield.”
George Washington, Farewell Address, Documents of Freedom 50 (2d ed.1979). Washington concisely stated some key concepts and invested them with peculiar importance. The encroachment of one power or branch upon the powers of another tends toward despotism. The necessity for checks and balances among the separate branches stems not from some formality or technical procedural requirement but from the very nature of the human heart and its love for power. Therefore, constant vigilance against such encroachment in civil government will always be necessary. And lastly, he explains in one sentence that although the encroachment may seem to remedy an urgent wrong, the *866 precedent of giving, by mere acquiescence to the judiciary, too much power to one branch always leads to an even greater wrong — the loss of the balance of power in a constitutional government. The final word as to “fixing” the constitution is always with the people.
The order issued by the trial judge on March 31, 1993, violated this delicate separation of powers by encroaching upon the duty of the Legislature to make law and policy regarding education in Alabama under Amendment 111 to the Constitution of Alabama of 1901. In doing so, the trial judge was without subject-matter jurisdiction of the case.

Nonjusticiable Provisions of a Constitution

A constitution determines who has the authority to exercise various powers. The Alabama Constitution delegates certain basic responsibilities to the Legislature. It enacts laws pursuant to that power. The Legislature represents all the people of the State of Alabama; it is familiar with all the programs requiring State funding; and it can conduct the type of fact-finding necessary to make policy judgments. The fact that the Constitution expressly delegates political powers to the legislative and executive branches makes decisions exercised pursuant to those powers outside the scope of judicial review unless those decisions contravene that Constitution.
“Much of the argument on the part of the plaintiff turned upon political rights and political questions, upon which the court has been urged to express an opinion. We decline to do so. The high power has been conferred on this court of passing judgment upon the acts of the State sovereignties, and of the legislative and executive branches of the federal government, and of determining whether they are beyond the limits of power marked out for them respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction. And while it should always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums.”
Luther v. Borden, 48 U.S. (7 How.) 1, 46-47, 12 L.Ed. 581 (1849).
An illustration from a provision found in the United States Constitution demonstrates this proposition. Like the Alabama Legislature, Congress has been delegated legislative power. Congress is given the power to raise an army and maintain a navy and to prescribe rules and regulations for the armed forces. The President is the Commander in Chief of the armed forces. Congress has the power to declare war. The President and Congress must perform their duties faithfully in providing for the defense of the country. They have to decide how to allocate funds among the competing programs. Because the Constitution assigns those powers to other bodies, the judiciary has no authority to review such decisions. If Congress declares war, the courts will not review that decision to determine whether it is a good idea or a bad one, fair or efficient. If Congress decides to build a missile-defense shield, the courts may not use a cost-benefit analysis to determine whether it is adequate to the defense of the country or whether that money would be better spent elsewhere. The courts cannot tell Congress or the President that it or he must give pay raises to the military, devote more time to hand-to-hand combat training, or inculcate values the courts believe will make the military better able to compete in a global environment.
*867 Likewise, Alabama courts do not have authority over decisions of the Legislature with regard to the constitutional exercise of their powers. May the courts tell the Legislature that the tax system is unfair and then go about reshaping it, or that the health-care system is unfair and go about establishing a new system? May a court tell the governor that the roads throughout the State are not paved fairly and equitably? The power of a court would not be restricted if there were no distinction between judicial questions and political questions or if the standard for reviewing statutes and constitutional provisions was whether they were “efficient and equitable?” Decisions regarding public education under the Alabama Constitution, like taxation, declarations of war, maintenance of an army or a navy, and the establishment of-a postal service under the United States Constitution are political in nature. Political powers are inherently different from judicial powers.
The constitutions of several states give their respective Legislatures jurisdiction to establish a “thorough and efficient” system of public education. See, e.g., DeRolph v. State, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997). Those words, “thorough and efficient,” are not in the Alabama Constitution, but they are the language Legislatures use in making cost-benefit analyses and which they must consider for the proper administration of the entire state government, not just one aspect thereof, like education. Those constitutions attempt to make explicit what is entailed in all political judgments. Efficiency is not a judicial standard. It is a political standard to be arrived at through the policy-making process of weighing the costs and the benefits of alternative courses of action. That process is inherently political in nature. In other words, even if Alabama’s constitutional provisions dealing with education required that public education be “thorough and efficient,” neither this Court nor any other court could review the Legislature’s application of those words. The Montgomery Circuit Court, in its analysis of one aspect of State government — education—endeavored to use the word “liberal,” another word of general application for the Legislature, as a standard of review. It failed, predictably, in that endeavor.
The main issue in the complaint filed by the plaintiffs is not education; it is the funding of public education,[42] i.e., how the citizens of Alabama are taxed to fund the system of public education. The trial court in this case has criticized the Legislature for enacting a purportedly unconstitutional taxing scheme where funding for education is concerned. Taxing is a distinctly legislative issue. As the United States Supreme Court aptly explained in Madden v. Kentucky, 309 U.S. 83, 87-88, 60 S.Ct. 406, 84 L.Ed. 590 (1940):
“The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized.... [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies.... It has ... been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification .... [T]he members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have.... ”
(Footnotes omitted.)
The trial court not only decided that Alabama’s system of taxation for education is inadequate; it also instructed the Legis *868 lature how it must distribute funds for education throughout the State. In other words, not only did the trial court infringe upon the Legislature’s power to tax; it also commandeered its spending power. The appropriation of public funds is also a distinctively legislative matter. “The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature.” Morgan County Comm’n v. Powell, 292 Ala. 300, 306, 293 So.2d 830, 834 (1974). In dictating to the Legislature how it must appropriate funds for public education, the trial court violated long-understood constitutional boundaries of jurisdiction between the branches of government.
In the context of this case, a court’s jurisdiction with respect to appropriation matters is necessarily limited. Courts have no jurisdiction over appropriation matters in a constitutional context beyond saying that the Legislature must spend money on what the Constitution commands it to spend money on, or that it cannot spend money on what the Constitution does not grant it the power to spend money on. They do not have the authority to tell the Legislature in what manner it must tax the citizenry or in what fashion it must spend public funds in a particular area.
Section 256 of the Alabama Constitution gives the Legislature the power to provide a “liberal” system of education. The circuit court, without proper justification, rewrote § 256 and replaced the term “liberal” with the term “equal.” Even if we were to construe the term “liberal” to mean “equal,” it is impossible to give any normal meaning to that term in an educational setting. As is evident from certain assertions made in this case, students with special needs are to be treated differently from students without special needs. There are innumerable variables that students bring with them to the educational setting, and even more that cannot possibly be controlled and equalized.[43] It may be that those decisions the circuit court has made and proposed to make are actually more familial in nature than legislative. Those decisions call for individualized treatment, which goes against the equality principle the circuit court wrote into § 256. The trial court went beyond its authority by acting as a Legislature, a school board, a censor of curricular matters, and even as a parent for all schoolchildren in Alabama’s public schools.

*869
Did a Case or Controversy Exist?

Another reason this Court can question the circuit court’s subject-matter jurisdiction in this case is the fact that during this case and particularly the period within which an appeal of the “Liability Order” could have been taken to this Court, the parties were not adverse to one another; therefore, no case or controversy existed. Chief Justice Hooper described much of the problem with respect to this issue in his 1997 dissent. “If the case was not a sham, it certainly has the appearance of one.” Ex parte James, 713 So.2d at 896 (Hooper, C.J., dissenting). I will review the main events that demonstrate the lack of a controversy in this case.
The history of the realignment of parties in this case is as follows. Originally, Governor Guy Hunt was a defendant, along with State Director of Finance Robin Swift, Lieutenant Governor James Folsom, Jr., Speaker of the House of Representatives James Clark, State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education. Later, all the defendants except Governor Hunt and his finance director were realigned as plaintiffs. Why? Because those defendants agreed with the position advanced by ACE.
The attorney general at the time, Jimmy Evans, indicted Governor Hunt and obtained a felony conviction after the trial judge had issued his “Liability Order,” which declared unconstitutional the State’s method of funding education. Governor Hunt’s conviction forced him from office on April 22, 1993, and Lieutenant Governor James Folsom, Jr., became governor. On June 9, 1993, the trial judge purported to certify the March 31, 1993, order as final under Rule 54(b).[44]
Then another realignment occurred. On May 28, 1993, Speaker Clark, Superintendent Teague, and the members of the Board of Education were realigned as defendants in their official capacities — again. On June 8, 1993, Governor Folsom was substituted as a defendant in place of former Governor Hunt. Folsom’s finance director then replaced Governor Hunt’s finance director as a defendant.[45] Why would these people return to being defendants? Had they not just recently realigned as plaintiffs?
A governor who agreed with the position advanced by the plaintiffs was now in office. To say that the office itself, not the individual occupying that office, was the party defies logic; an office can assert neither a favorable nor unfavorable position without the person who directs its actions. The alignment of plaintiffs and the defendants in the Equity Funding Case ended this way — those defendants who agreed with the plaintiffs and therefore had realigned as plaintiffs later re-realigned as defendants when Folsom became governor. No one was adverse to anyone in the case, i.e., no justiciable controversy existed, and the case should have been dismissed. Alabama Nursing Home Ass’n v. Alabama State Health Planning Agency, 554 So.2d 1032, 1033 (Ala.Civ.App.1989) (“ ‘[T]he circuit courts of this state do not have jurisdiction to issue advisory opinions when there is no case or controversy presented.’ ”).
The question of the existence of a case or controversy is not an idle debate. That *870 there be an actual controversy between parties that appear before a court has from time immemorial been a bedrock judicial principle. The question involves the foundational principles upon which our tripartite form of constitutional government was formed. This Court has stated:
“[0]ur Constitution vests this Court with a limited judicial power that entails the special competence to decide discrete cases and controversies involving particular parties and specific facts. Ala. Const.1901, amend. 328, § 6.01 (vesting the judicial power in the Unified Judicial System); see, e.g., Copeland v. Jefferson County, 284 Ala. 558, 561, 226 So.2d 385, 387 (1969) (stating that courts decide only concrete controversies between adverse parties).”
Alabama Power Co. v. Citizens of Alabama, 740 So.2d 371, 381 (Ala.1999) (emphasis added). See also Jefferson County v. Johnson, 232 Ala. 406, 406-07, 168 So. 450, 451 (1936), in which this Court stated:
“The weight of authority is that, to give the court jurisdiction to render a declaratory judgment, there must be ‘a bona fide existing controversy, with subject-matter and parties in interest in court, and a situation where adequate relief is not presently available through medium of other existing forms of action.’ Union Trust Co. of Rochester v. Main & South Streets Holding Corporation, 245 App.Div. 369, 282 N.Y.S. 428, 429 [headnote 2]; 33 Corpus Juris, p. 1097, § 57.”
This matter ceased to be a controversy, if in fact it ever was one, when Governor Hunt was removed from office.[46] At that point, no adversary relationship existed before or after certification of the final order, thereby denying the trial court the opportunity to hear a full debate of the issues and to fully adjudicate the matters in question. The Equity Funding Case is a classic example of a nonjusticiable controversy; clearly, the trial court lacked jurisdiction to issue an order where no controversy existed.

The August IS, 1991, Order

The trial court in this case lacked subject-matter jurisdiction, and no justiciable controversy existed; therefore, this Court should examine the rulings actually finalized in this case. On January 22,1991, the plaintiffs moved for a partial summary judgment on their claim that Amendment 111 of the Alabama Constitution was adopted in violation of the Fourteenth Amendment to the United States Constitution. The trial court declared on August 13, 1991, that Amendment 111'was void in its entirety because one portion of the Amendment violated the Equal Protection Clause of the United States Constitution. The court also held that § 256 of the Alabama Constitution of 1901 was in effect to the extent that it provides: “The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years,” but that the second and third sentences of § 256 were void, also as violating the Fourteenth Amendment.
This ruling set the table for the “Liability” and “Remedy” Orders, because it opened the door for the trial court to impose its own requirements on the Legislature concerning public education, rather than those of Amendment 111. That Au *871 gust 13, 1991, order has never been appealed to this Court, and this Court has never issued an opinion addressing the question of the plaintiffs’ standing to file the action or the legitimacy of the trial court’s order determining that Amendment 111, to the extent it amended § 256, was unconstitutional. The trial judge’s method of constitutional interpretation leaves much to be desired,[47] but because of the jurisdictional problems in this case, it would not be essential to a ruling by this Court dismissing the case.
In them complaint, the plaintiffs sought “[a] declaration that Amendment 111 of the Constitution of Alabama violates the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.” The basis for this declaration, the complaint explained, was that Amendment 111 “has a racially discriminatory purpose and effect.” The plaintiffs, however, never alleged in their complaint that they were the victims of racial discrimination. In fact, none of the plaintiffs even mentioned their race in the complaint.[48] Unless the plaintiffs showed that the Legislature “authorize[d] the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end,” there can be no injury to anyone based on Amendment 111. No one in this case ever alleged that he or she was a victim of a violation of the United States Constitution based on a racially discriminatory application of § 256 or of Amendment 111, Ala. Const.1901. Thus, although a certain section of Amendment 111 ap *872 pears on its face to be discriminatory, because no plaintiff in this case alleged that he or she suffered an injury under this section, no case and controversy was ever presented to the trial court to invoke its jurisdiction. Amendment 111 had substantially amended § 256, and the ruling of the United States Supreme Court in Brown effectively prohibited either Amendment 111 or § 256 from being interpreted to allow any racial discrimination.
Declaratory judgments are issued pursuant to § 6-6-222, Ala. Code 1975.[49] “There must be a bona fide existing controversy of a justiciable character to confer upon the court jurisdiction to grant declaratory relief under the declaratory judgment statutes.... ” State ex rel. Baxley v. Johnson, 293 Ala. 69, 73, 300 So.2d 106, 110 (1974). In fact, “the [complaint] must show such a controversy to exist before the court has jurisdiction to grant declaratory relief under the Declaratory Judgment Act.” City of Mobile v. Jax Distrib. Co., 267 Ala. 289, 290, 101 So.2d 295, 296 (1958). As I stated above, the plaintiffs made no allegations of racial discrimination in their complaint.
The racially discriminatory portion of Amendment 111 was not, when this action was filed, and is not now, applied in this State, nor did the plaintiffs allege that they had been discriminated against on the basis of this provision.[50] Because the *873 plaintiffs did not allege in their complaint that they were harmed through racial discrimination resulting from the application of Amendment 111, they lacked standing to move for a declaration of unconstitutionality.
“‘To present a justiciable case or controversy, the individual plaintiff must have standing to sue; to have standing, the individual must allege an injury directly arising from or connected with the wrong alleged. The standing requirement applies whether the plaintiff sues individually or on behalf of a class.’ ”
Ex parte Blue Cross & Blue Shield of Alabama, 582 So.2d 469, 474 (Ala.1991) (quoting 1 Newberg on Class Actions, p. 190 (1977)).
“When a party without standing purports to commence an action, the .trial court acquires no subject-matter jurisdiction. Barshop v. Medina County Underground Water Conservation District, 925 S.W.2d 618, 626 (Tex.1996) (‘Standing is a necessary component of subject matter jurisdiction’). See also Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); United States v. Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (“‘standing ‘is perhaps the most important of [the jurisdictional] doctrines’ ” ’); National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (‘Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.’); Romer v. Board of County Comm’rs of the County of Pueblo, supra, 956 P.2d [566] at 585 [(Colo.1998)] (‘standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings’) (Martinez, J., dissenting); Cotton v. Steele, 255 Neb. 892, 587 N.W.2d 693 (1999).”
State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala.1999).
In their briefs filed in response to the January 10, 2002, order of this Court and in answer to four questions propounded by this Court to the parties, the plaintiffs allege, without supporting proof, the following injurious effects of Amendment 111: continuing existence of all-white academies, a reduction of the white population in the public schools as a result of the existence of such academies, and the lack of public support for public education as a result of private schools. For the first time since this case has been litigated, the plaintiffs tell us that “[m]any of the plaintiff parents and schoolchildren are black.” ACE Brief, p. 50. For a plaintiff to have made a claim that Amendment 111 is racially discriminatory and therefore unconstitutional, without even identifying the *874 plaintiffs race, is a significant omission. Nevertheless, even -with that belated addition of a most critical element of a racial-discrimination claim in the plaintiffs’ latest briefs to this Court, it remains that they have not shown any actual particularized injury or harm that has occurred to black plaintiffs caused by Amendment 111. Such a showing is essential to establish standing for the plaintiffs to file such an action.[51] In view of the fact that the Legislature never used Amendment 111 to discriminate against any school students and the inability of any student plaintiffs to show an “actual injury” resulting from Amendment 111, plaintiffs did not have standing to bring this case.
The plaintiff school boards claim standing because they are charged with supervising the educational interests of each county and with maintaining a uniform and effective system of public schools throughout their respective counties. They argue that the State’s method of disbursing funds prevents them from performing this duty. However, the Alabama Constitution grants to the Legislature the supervision and maintenance of public schools; the Legislature has delegated some of that power to the school boards, but nowhere does a statute or a constitutional provision give county school boards the power of initial disbursement of taxpayer funds. More importantly, the school boards are an entity created by the Legislature and *875 are a part of the State itself. The State cannot sue itself.
Because the plaintiffs lacked standing to sue on the issue of racial discrimination, the very reason the trial court declared Amendment 111 unconstitutional, that claim was not ripe for adjudication and the trial court should not have entertained it. “The declaratory judgment statutes do not empower courts to decide moot questions, abstract propositions or to give advisory opinions, however convenient it might be to have the questions decided for the government of future cases.” Alabama-Tennessee Natural Gas Co. v. City of Huntsville, 275 Ala. 184, 192, 153 So.2d 619, 626 (1963). Because the trial court lacked jurisdiction to declare Amendment 111 unconstitutional, the court’s revival of the original § 256 was also unnecessary and improper.
The plaintiffs’ core claim was that the Alabama public school “funding structure is economically detrimental to the State of Alabama and irreparably damaging to the education of its schoolchildren.” A declaration of unconstitutionality with regard to Amendment 111 was requested to rid the plaintiffs of the Amendment’s declaration that “nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education,” not to dispose of a racially discriminatory provision.
A constitutional provision granting the Legislature complete discretion in formulating an education system prevents any lawsuit complaining about inequitable funding in that system. If the plaintiffs had presented a document, similar in content to the March 31, 1993, “Liability Order,” to the Legislature or to a legislative committee charged with education funding, it would have been appropriate as a lobbying tool to accomplish the plaintiffs’ goals. Instead, they sought to employ the judiciary to force the Legislature’s hand. This is contrary to the proper purposes of a lawsuit. Though the “Liability Order” may contain many laudable goals for education in Alabama, this Court cannot allow good intentions to stand in place of the rule of law. Where the Legislature has been given discretion by the people, it is not the place of the courts of this State to interpose their own will in the stead of the voters.
If ever the State of Alabama uses the provisions of Amendment 111 and § 256, Ala. Const.1901, to discriminate against citizens of this State on the basis of race and a party with standing exercises a challenge to those provisions seeking a declaratory judgment, then, on appeal, this Court can review that case and analyze those parts of the constitution under appropriate legal guidelines. But the trial court in this case did not have before it a party alleging injury caused by Amendment 111 or by § 256, and the August 13, 1991, order was too intimately bound in purpose with and as a basis for the rest of the rulings entered in this case. Therefore, the trial judge lacked jurisdiction over the entire case, including those issues addressed in the August 13, 1991, order.

Conclusion

In his farewell address, the first President of the United States warned us to “resist with care the spirit of innovation upon [the Constitution’s] principles, however specious the pretexts.” Farewell Address at 47. The division of powers between different branches of government, each with a distinct area of operation, is a basic principle of the Constitution of the United States and the Constitution of the State of Alabama. Equally true is the fact that there exist many “pretexts” that invite a violation of that separation by the *876 usurpation of the powers of one branch by another, such as the genuine desire for quality education.
We are all legitimately concerned about the education of our children. The Constitution of Alabama wisely placed the issue of public education in the hands of those best able to discern the wishes of the people — the elected representatives of the people, the Alabama Legislature. The judges of this State were not elected to formulate policy for education or to spearhead education reform. Judges are elected to ensure that justice is administered in accordance with fundamental principles of law. The acknowledged role of a judge is to interpret the law, not to make the law; “he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.” 1 William Blackstone, Commentaries on the Laws of England, at 69. The job of making law belongs exclusively to the Legislature. The desire or need for action in a particular area of public policy cannot justify a court’s intruding itself into the field of legislation in order to reach a desired result, whether that result concerns education, health care, taxation, or any other area of public interest.
With regard to one branch of civil government breaching the separation-of-powers principle by acting outside its assigned sphere of authority, Washington said that “the precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use can at any time yield.” Farewell Address at 50. That permanent evil begins to be reflected in this case in the myriad of conflicting orders, the alignment and realignment of parties attempting to create adversity, the lack of standing of any party to challenge the constitutionality of § 256 and Amendment 111, the pendency of the case for over 12 years with no foreseeable conclusion, and the threatened imposition by one trial court judge of over a billion dollars of taxes on the people of Alabama without their consent.
For the trial judge to have campaigned for a position on the Alabama Supreme Court by claiming that he told the governor and the Legislature what to do is not only unethical, but such orders to the governor and the Legislature are also a clear usurpation of the powers of coequal branches of government and a violation of our Constitution. I agree with the majority opinion that the judicial branch should leave the repair, renovation, improvement, and/or overhaul of the education system of this State to the Legislature, the governor, the State Board of Education, local boards of education, and the people of Alabama, where it properly belongs.
' That this matter was outside the subject-matter jurisdiction of the Montgomery Circuit Court is clear. No justiciable controversy existed, not only because of the absence of ‘ a plaintiff with standing to bring an action alleging racial discrimination but also because of a lack of adversity, both before and after the certification of the March 31, 1993, order. Moreover, the lack of subject-matter jurisdiction is clearly evident in the fact that the circuit court had absolutely no authority to make legislative and executive decisions necessary to operate a school system or to set public policy in the field of education. Such decisions are political in nature and are not within the purview of the judicial branch of government.
The finality of any order depends on the existence of a court’s jurisdiction over the case. The lack of subject-matter jurisdiction may not be waived and may be raised by the parties at any time or by the court ex mero motu. That question is a funda *877 mental one, preliminary to any adjudication. Absence of subject-matter jurisdiction deprives the court of all authority to act whatsoever.
The courts must ever be cognizant of their own limitations under our Constitution. I recognize the inherent evil in usurping the power of the legislative branch, and reaffirm the proper role of the courts not to make the law, but to say what the law is.
Because the trial court never had subject-matter jurisdiction, all orders the trial court issued were therefore void. In addition to dismissing these cases, I would also overrule Ex parte James, Pinto v. Alabama Coalition for Equity, and Opinion of the Justices No. 338, supra, to the extent that those cases are inconsistent with the proper exercise of the judicial power by the courts of this State.

. A court may not issue an order in a case if it lacks subject-matter jurisdiction; there must always be a "case” for a trial court to review, i.e., a controversy between at least two adverse parties. Amendment 328, § 6.04(b), Ala. Const. 1901. "The lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu.” Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143, 1146 (Ala.Civ.App.1986). "Ex mero motu” is the Latin phrase for "on the court’s own motion.”

. The United States Supreme Court explains nonjusticiable political questions this way:
"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment. from multifarious pronouncements by various departments on one question.”
Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

. Funding, both its appropriation aspect and spending aspect, is a function of the legislative branch. Art. IV, Ala. Const.1901.

. The University of Alabama and Auburn University filed a motion to intervene on June 8, 1993, within the 42-day period for an appeal, but the trial court denied that motion on July 19, 1993. Even though “the power to regulate and control the public schools is confided to the Legislature,” Dickinson v. Cunningham, 140 Ala. 527, 541, 37 So. 345, 348 (1904), the Legislature could not have appealed the trial court’s order because it was not properly a party to the case. The Ander-ton and Pinto classes did not file their intervention motions until after the 42-day appeal period expired. Nevertheless, Justice Houston, concurring in the result, wrote pointedly in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995), as to the odd procedural results in the trial court:
"I am not a member of the legislative branch or the executive branch of government, whose responsibilities include providing for public education. I am a member of the judicial branch of government, which is enjoined by the Constitution of Alabama of 1901, Article III, § 43, to 'never exercise the legislative and executive powers, or either of them.! This limitation does not impinge upon the judicial duty to interpret the constitution and say what the law is. However, it is in the failure of the defendants, realigned as plaintiffs, and then, after the liability order was entered, realigned as defendants, to challenge the trial court’s interpretation of the constitution in the liability order and in the non-final remedy orders that causes me to hold that these interve-nors [the Anderton and Pinto classes] were not adequately represented. San Antonio Independent School District v. Rodriguez, [411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).]”
662 So.2d at 903-04 (Houston, J., concurring in the result). This peculiar situation must be part of the reason Chief Justice Hooper called the case a “sham.” Ex parte James, 713 So.2d 869, 896 (Ala.1997) (Hooper, C.J., dissenting). The fact that there existed no adverse party to appeal during that 42-day period contradicts this Court's statement in Ex parte James that "any infirmity allegedly attaching after Governor Hunt left the case was assuredly cured by the participation of the present State parties and the intervenors.” 713 So.2d at 878. In light of the fact that there was no adverse party to appeal the March 31, 1993, order, such a statement represents a shocking denial of reality. .

. Just one of the dozens of different requirements the trial court placed on the defendants in this matter was the following:
" 'Schools shall have appropriate maintenance services that provide for systematic repair and care of the site, buildings and equipment. School buildings and grounds shall be clean, safe and sanitary. Bathroom supplies, including soap, paper towels and toilet paper shall be available in adequate supply at all schools.’ "
See VII. A. of the trial judge's December 3, 1993, Remedy Order, Ex parte James, 713 So.2d 869, 929 (Ala.1997), attached as an appendix to Chief Justice Hooper’s dissent.
The "Liability Order” was even more ambitious:
"(e) [AJdequate educational opportunities shall consist of, at a minimum, an education that provides students with the opportunity to attain the following:
[[Image here]]
"(ix) sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential.”
March 31, 1993, Order, Conclusion, ¶ 2.e.ix, Opinion of the Justices No. 338, 624 So.2d 107, 166 (Ala.1993). How a trial court judge in Montgomery would have more expertise as to the most minute aspects of the administration of education than both houses of the Alabama Legislature, the Governor, the State Board of Education, and all 67 county boards of education in this State is beyond my ability to conceive. The United States Supreme Court wisely refused to exercise such tremendous power in a 1973 case:
"The majority of the United States Supreme Court wisely noted in San Antonio Independent School District v. Rodriguez, 411 U.S. at 42-43, 93 S.Ct. at 1301-02:
" 'In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court’s lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of " ‘intractable economic, social, and even philosophical problems.’ ” Dandridge v. Williams, 397 U.S. 471, at 487 [90 S.Ct. 1153, at 1163, 25 L.Ed.2d 491] (1970). The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them,” and that, within the limits of rationality, “the legislature’s efforts to tackle the problems” should be entitled to respect. Jefferson v. Hackney, 406 U.S. 535, at 546-47 [92 S.Ct. 1724, 1731, 32 L.Ed.2d 285] (1972)..
“Nonetheless, the trial court chose to enter this complex area. No appeal was taken from that decision, and the Alabama Judiciary is now involved in determining fiscal and educational policy.”
662 So.2d at 909-10 (Houston, J., concurring specially).

. In addition, one of the bases that the trial court rested his March 31, 1993, "Liability Order” upon was Alabama’s "equal protection clause” contained in §§ 1, 6, and 22, a clause that we have since explained does not exist and never has existed in the 1901 Alabama Constitution. See Ex parte Melof, 735 So.2d 1172 (Ala.1999). However, in my opinion, the decision in this case depends on an even more fundamental basis, i.e., subject-matter jurisdiction.

. Justice Houston expressed his concern about the court's infringing on the powers of the Legislature in his special writing in Pinto:
“One cannot read the trial court's March 31, 1993, liability order without wondering why this was not appealed to this Court (a Court composed of Justices elected from the state-at-large by taxpayers and citizens and parents of school students) and without concluding either that additional taxes must be imposed or that existing educational tax dollars must be redistributed to carry out the mandate of the trial court's order.
"The dreaded 'taxation without representation' may occur if the trial court, for whom the Anderton intervenors had no right to vote, attempts to impose taxes in the remedy phase of this trial to fulfill the duties imposed upon State officials in the liability phase. The assurance that there would be no taxation without representation was a concept upon which this nation was founded. If that concept is not sufficient to provide a class of taxpayers ‘a direct, substantial, and legally protectable interest in the proceeding,' I do not know what is!”
662 So.2d at 902 (Houston, J., concurring specially). He quotes authoritatively in a footnote the following:
"This power to impose burdens and raise money is the highest attribute of sovereignty, and is exercised, first, to raise money for public purposes only; and, second, by the power of legislative authority only. It is a power that has not been extended to the judiciary....” Rees v. City of Watertown, 19 Wall. 107, 116-117, 22 L.Ed. 72 (1874).”’
662 So.2d at 902 n. 4.

. This Court stated in Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 898 n. 2 (Ala.1995):
"Our [April 10, 1995,] order [denying a writ of prohibition as to the Liability Order] stated that the trial court's March 31, 1993, order had become ‘final and appealable on July 21, 1993.’ Actually, as the statement of facts in this present opinion indicates, that March 31, 1993, order had become final, and therefore appealable, on June 9, 1993. On July 21, 1993, the 42-day appeal period expired, with no appeal having been taken.”
In Ex parte James, 713 So.2d 869 (Ala.1997), this Court briefly addressed the certification question. This Court commented in its advisory opinion of April 27, 1993, on the procedural status of the case at that time as follows:
"This order is not presently appealable, because the trial court has retained jurisdic *847 tion in order to address other aspects of this litigation....
"The Justices typically refuse to answer questions involving matters that are the subject of pending litigation. The question posed by Senate Resolution 97, however, is of great importance to the people of the State of Alabama and to the Legislature, and your request for an Advisory Opinion indicates that you are interested in promptly addressing the matters required to be addressed by the order of the circuit court in the two consolidated cases.

"Because the legal issues presented in those cases could he raised on appeal, provided an appeal should be taken within the time provided for by Rule 4, Ala.RApp.P., we deem it both appropriate and advisable that we call your attention to some of the principles of law that govern us as we respond to your inquiry."

Opinion of the Justices No. 338, 624 So.2d at 108-09. There is no indication that any party addressed the justiciability issue at that time.

. Section 256, as amended by Amendment 111, states:
"It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose conditions or procedures deemed necessary to the preservation of peace and order.
"The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds and the lease, sale or donation of real or personal property to or for the benefit of citizens of *848 the stale for educational purposes under such circumstances and upon such conditions as it- shall prescribe. Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.
"To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide.”

. For example, Rule 54(b) would allow a circuit court judge to certify as final a summary judgment granted for one defendant in a multiple-defendant case in order to expedite appeal of that particular judgment. Otherwise, a trial might proceed as to the other defendants. Even in that situation, however, the summary judgment granted the one defendant must still meet the rule for finality, i.e., it must adjudicate all claims as to that defendant.

. Section 12-22-2, Ala.Code 1975, provides:
"From any final judgment of the circuit court or probate court, an appeal lies to the appropriate appellate court as a matter of right by either party, or their personal representatives, within the time and in the manner prescribed by the Alabama Rules of Appellate Procedure.”

. This is a reference to Rule 54(b), Fed. R.Civ.P. "Rule 54(b) [Ala.R.Civ.P.] is a verbatim copy of its counterpart in the Federal Rules of Civil Procedure.” Cates v. Bush, 293 Ala. 535, 538, 307 So.2d 6, 8 (1975).

. Rule 2, Ala.R.Civ.P., states that "[tjhere shall be one form of action to be known as 'civil action.’ ”

. Can the Legislature be named a party in such an action? It is questionable whether it can. As this opinion illustrates, if the court questions the wisdom or policy choices of the Legislature without finding it "clear beyond a reasonable doubt that [the Legislature is acting] violative of the fundamental law,” State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 334, 186 So. 487, 489 (1939), and then in order to fashion an appropriate remedy, needs the Legislature as a party, surely we have a political question of the first order. And has not the court, in ordering the Legislature to act in such a situation, simply remade itself into a superlegislature with self-appointed authority to overrule the Legislature at will, even without a case against the Legislature being filed? Neither the constitution nor the most expansive jurisprudential philosophy would support such arrogation of power by this Court, much less by a local trial court judge.

. See Ex parte James, 713 So.2d 869, 912-17 (Ala.1997) (Hooper, C.J., dissenting).

. For example, the "Liability Order” contained the following language:
"(e) adequate educational opportunities shall consist of, at a minimum, an education that provides students with opportunity to attain the following:
"(i) sufficient oral and writtén communication skills to function in Alabama, and at the national and international levels, in the coming years;
"(ii) sufficient mathematic and scientific skills' to function in Alabama, and at the national and international levels, in the coming years;
"(iii) sufficient knowledge of economic, social, and political systems generally, and of the history, politics, and social structure of Alabama and the United States, specifically, to enable the student to make informed choices;
"(iv) sufficient understanding of governmental processes and of basic civic institutions to enable the student to understand and contribute to the issues that affect his or her community, state, and nation;
"(v) sufficient self-knowledge and knowledge of the principles of health and mental hygiene to enable the student to monitor and contribute to his or her own physical and mental well-being;
"(vi) sufficient understanding of the arts to enable each student to appreciate his or her cultural heritage and the cultural heritages of others;
"(vii) sufficient training, or prepáration for' advanced training, in academic or vocational skills, and sufficient guidance, to enable each child to choose and pursue life work intelligently;
"(viii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in. Alabama, in surrounding states, across the nation, and throughout the world, in academics or in the job market; and
"(ix) sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential."
March 31, 1993, Order, Appendix to Opinion of the Justices No. 338, 624 So.2d 107, 166 (Ala.1993).

. Merriam Webster’s Collegiate Dictionary (10th ed. 1999).

. This year, the Connecticut Supreme Court distinguished judicial and political questions in the education context. The Connecticut plaintiffs claimed that one town in one county was discriminated against in the distribution of education funds for that county because of a particular statute:
"The named defendant, Attorney General Richard Blumenthal, moves to dismiss the case for lack of subject matter jurisdiction in that: (1) the claims raise nonjusticiable political questions; and (2) the plaintiffs lack standing to pursue their claims.
[[Image here]]
"The plaintiffs argue that the present case poses a pure constitutional, not a political question....
[[Image here]]
"The concluding paragraph in [San Antonio Independent School District v.] Rodriguez[, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)] is instructive, stating that: '[t]he consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative process of the various States ... the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them. Id., 58-59[, 93 S.Ct. 1278]. The issue upon which Horton[ v. Meskill, 172 Conn. 615, 626, 376 A.2d 359 (1977)] was decided was whether the state was providing a substantially equal opportunity to its youth. In the present case the plaintiffs make no claim as to the adequacy of the educational opportunity but only question the sources of the funding. There is no claim that Article Eighth, § 1, of the constitution of Connecticut has been violated. Accordingly, the questions cast by the plaintiffs as equal protection claims are actually questions for lawmakers and are non-justiciable. Based on this finding, it is unnecessary to address the issue of plaintiffs’ standing.
"For the foregoing reasons, the defendant's motion to dismiss is granted."
Seymour v. Region One Board of Education et al., 28 Conn. L. Rptr. 508 (Conn.2001) (emphasis added; not published in A.2d).

. That emphasis explains the popular title of these cases — "Equity Funding Case.”

. Even the United States Supreme Court refused to exercise such power when asked to do so in the 1975 case, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 42-43, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973):
“On even the most basic questions in this area the scholars and educational experts are divided. Indeed, one of the major sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education — an assumed correlation underlying virtually every legal conclusion drawn by the District Court in this case. Related to the questioned relationship between cost and quality is the equally unsettled controversy as to the proper goals of a system of public education. And the question regarding the most effective relationship between state boards of education and local school boards, in terms of their respective responsibilities and degrees of control, is now undergoing searching reexamination. The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to Iteeping abreast of ever-changing conditions."
(Footnotes omitted; emphasis added.)

. Rule 54(b) certifications should be granted only in exceptional cases; they “should not be entered routinely or as a courtesy or accommodation to counsel.” Page v. Preisser, 585 F.2d 336, 339 (8th Cir.1978).

. As this Court stated in Opinion of the Justices No. 338: “The Court assumes that the finance director adopts the positions taken by Governor [Folsom].” 624 So.2d at 112 n. 3.

. In Ex parte James, this Court, in holding that the case was justiciable, cited an April 6, 1993, newspaper article that stated that Hunt would not appeal the March 31, 1993, order. That article was published before the order even became final on June 9, 1993. This Court should not rely on speculation in a newspaper article to determine legal issues of such moment as whether a case or controversy exists in this case.

. I agree with Justice Houston's thorough autopsy of the ruling in his special writing. Chief Justice Hooper, in his dissent in Ex parte James, referred to this rewriting of constitutional provisions by the trial judge as "selective editing ... by judicial fiat.” Ex parte James, 713 So.2d at 901. Even granting that the sentences in both the original § 256 and that section as amended by Amendment 111 that refer to segregated schools are unconstitutional, that is not a reason to strike the perfectly viable portions of Amendment 111, or, for that matter, of the original § 256. In fact, the rule of interpretation is the opposite:
"The unconstitutionality of a part of an act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.”
Champlin Refining Co. v. Corporation Comm’n, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).

. The plaintiffs made three other claims. They indicate that the action was an integrated attempt to enact the plaintiffs’ version of education reform and that the claim as to Amendment 111 was bundled within that overarching purpose:
"[2] The statutes, procedures, and administrative determinations constituting the State funding structure for public education in the State of Alabama result in disparities between the ability of property wealthy local school systems and the ability of property poor local school systems to provide equal educational opportunity for children within those systems in violation of Sections 1, 6, and 22 of the Constitution of Alabama, which guarantees equal protection of the law.
"[3] The statutes, procedures and administrative determinations constituting the State funding structure for public education in the State of Alabama are irrational and arbitrary, and deprive the individual plaintiffs to this action of their rights to equal protection and due process of law as guaranteed by the Fourteenth Amendment of the Constitution of the United States.
"[4] The statutes, procedures and administrative determinations constituting the State funding structure for public education in the State of Alabama are irrational and arbitrary, and deprive the individual plaintiffs to this action of their right to due process of law as guaranteed by Sections 6 and 13 of the Constitution of Alabama.”
Complaint of ACE, R. 27-28.

. The statute, also known as the Declaratory Judgment Act, provides, in pertinent part: "Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.”

. As the United States Supreme Court has explained with respect to federal cases, an allegation of actual injury is essential for the parties to have standing to appear in court.
In O’Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the plaintiff class purported to represent " 'all those who, on account of their race or creed and because of their First Amendment rights, have (been) in the past and continue to be subjected to the unconstitutional and selectively discriminatory enforcement and administration of criminal justice in Alexander County.' ” 414 U.S. at 491, 94 S.Ct. 669. No one in the case had alleged direct discrimination, however. The parties had simply maintained in the abstract that the laws in Alexander County were being selectively enforced against blacks as opposed to whites. On those claims, the Supreme Court held:
"The complaint failed to satisfy the threshold requirement imposed by Art. Ill of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy. Plaintiffs in the federal courts 'must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction.’ There must be a personal stake in the outcome’ such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.’ ... Abstract injury is not enough. It must be alleged that the plaintiff ‘has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. The injury or threat of injury must be both 'real and immediate,’ not ‘conjectural’ or 'hypothetical.' Moreover, if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.”
414 U.S. at 493-94, 94 S.Ct. 669 (citations and footnotes omitted; emphasis added).
In Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the plaintiffs, parents of black schoolchildren attending public schools, alleged that the Internal Revenue Service failed to deny tax-exempt status to racially discriminatory private schools, in contravention to statute and the United States Constitution's Equal Protection Clause. "Respondents do not allege that their children have been the victims of discriminatory exclusion from the schools whose tax exemptions they challenge as unlawful.... Rather, respondents claim a direct injury from the mere fact of the challenged Government conduct....” 468 U.S. at 746, 104 S.Ct. 3315. The Court stated:
*873 "[T]he case or controversy requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are ‘founded in concern about the proper — and properly limited — role of the courts in a democratic society.' ”
468 U.S. at 750, 104 S.Ct. 3315.
“[A] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.''
468 U.S. at 738, 104 S.Ct. 3315.
"Insofar as their first claim of injury is concerned, respondents are in exactly the same position: unlike the appellee in Heckler v. Mathews, [465 U.S. 728, 740-41 n. 9, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984)], they do not allege a stigmatic injury suffered as a direct result of having personally been denied equal treatment.”
468 U.S. at 755, 104 S.Ct. 3315 (summarizing the cases Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)).

. Individual “injury in fact” is critical to the question of standing. See United States v. Hays, 515 U.S. 737, 742-44, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995):
"The question of standing is not subject to waiver, however: '[W]e are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of the [jurisdictional] doctrines.” ’
"It is by now well settled that 'the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact” — an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.’ In light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.
[[Image here]]
"The rule against generalized grievances applies with as much force in the equal protection context as in any other. Allen v. Wright, [468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)], made clear that even if a governmental actor is discriminating on the basis of race, the resulting injury 'accords a basis for standing only to "those persons who are personally denied equal treatment” by the challenged discriminatory conduct.’ ”
(Citations omitted; emphasis added.) The general accusations against the private-school system are inadequate and unsupported, and they do not show actual individual racial discrimination against the black plaintiff schoolchildren, much less the white plaintiff schoolchildren and the handicapped children. Do the plaintiffs seriously contend that the existence of private schools, for which there is no evidence as to how many are "all white,” denies public education to those black children in public schools? And, if I were to assume that a drop in support for public education has occurred, do the plaintiffs seriously contend that there exists a constitutional right not to have a drop in public support for education? And to what am I to attribute that drop in public support? I have no evidence of the contention that white parents are racially motivated in using private schools. It could be that parents of both races are dissatisfied with the quality of the public schools. I question whether adequate evidence of such an "injury” by the "public” could ever support a claim against the civil government of the State of Alabama.